**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 91-8583
_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

ELLIS RAY THOMAS, A/K/A NUMBER 7, JERRY THOMAS
MAXWELL, STEVEN DARREL GREGG, MODESTO SERNA
SANCHEZ, JR., A/K/A NUMBER 6, and ROY LEE HODGKISS,

                              Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
_____

(December 21, 1993)

Before WIENER and EMILIO M. GARZA, Circuit Judges, and LITTLE[*],
District Judge.

EMILIO M. GARZA, Circuit Judge:

     Defendants Ellis Ray Thomas ("Thomas"), Jerry Thomas Maxwell
("Maxwell"), Steven Darrel Gregg ("Gregg"), Modesto Serna Sanchez,
Jr. ("Sanchez"), and Roy Lee Hodgkiss ("Hodgkiss") were jointly
tried before a jury and convicted of various offenses stemming from
a conspiracy to distribute narcotics.  Thomas, Maxwell, Gregg, and
Sanchez were convicted of conspiring to possess a controlled
substance with intent to distribute, in violation of 21 U.S.C. §§

_____

     [*]     District Judge of the Western District of Louisiana, sitting by
designation.

841(a)(1) and 846 (1988). The jury also found Thomas and Sanchez guilty of possessing a controlled substance with intent to distribute and aiding and abetting such possession, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Additionally, Sanchez was found guilty of money laundering and aiding and abetting money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2. Hodgkiss was convicted of engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(a)(1), and of using or carrying a machine gun in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). All five defendants now appeal their convictions and sentences. We affirm in part and reverse and remand in part.

**I**

From 1986 to 1989, Hodgkiss operated an extensive conspiracy to distribute cocaine, amphetamine, methamphetamine, and marijuana in central Texas. Hodgkiss employed many people, including government witnesses Aaron Clark and Robbie Curtis, to store, transport, and distribute controlled substances. To facilitate the purchase and sale of narcotics, and to insulate the conspiracy from detection by law enforcement personnel, Hodgkiss devised a code system utilizing digital pagers. Hodgkiss assigned code numbers to various people,[1] types of drugs, and locations where the sales were

---

[1] John Rogala and his associates were "01"; Alan Gardner and his associates were "03"; Sanchez was "06"; Thomas was "07"; Vance Zimmerman was "10"; Wesley Schneider was "13"; Clark was "14"; Curtis was "17"; Keith and Angela Norman were "26"; and Donald Copeland was "333". The government was unable to discover

to be consummated.  Customers would contact Hodgkiss to set up a drug deal.  Hodgkiss then would use the pagers to notify his employees that, for example, person "01" would be waiting at location "01" to purchase a specified amount of drug "01." Hodgkiss kept records detailing many of the drug transactions he arranged.

Hodgkiss obtained the drugs distributed by his retailers from various sources.  John Rogala provided Hodgkiss with much of the cocaine distributed by the conspiracy, while Alan Gardner sold large quantities of methamphetamine to Hodgkiss.[2]  Eventually, Hodgkiss and Rogala began manufacturing methamphetamine themselves at a laboratory they established near Smithville, Texas.  Hodgkiss and Rogala also attempted to import large quantities of marijuana into the United States from Mexico, although they ultimately were unsuccessful.

An investigation by local and federal authorities led to the arrests of twenty-nine participants in the Hodgkiss conspiracy, including the defendants, all of whom were charged in an indictment alleging a number of drug-related offenses.[3]  A jury found the five

the identities of "09", "10", and "69".

[2]      Hodgkiss also arranged purchases of drugs from David LeBoeuf, Joe Reed, Kanetha Childers, Diane Watson, Clyde McCullar, and Billy Basham.

[3]      On December 14, 1989, agents seized from Hodgkiss's home drug ledgers, a list of code numbers and telephone numbers assigned to Hodgkiss's distributors, a small amount of methamphetamine, over $20,000 in cash, a telephone scrambling device, and firearms.  Agents already had seized drug ledgers, methamphetamine, marihuana, and other narcotics from Gregg's home. Agents who searched Sanchez's residence in March 1990 seized a scale of the type commonly used to weigh drugs, a trunk containing marihuana residue, and a telephone scrambling device.  Agents searching Maxwell's house seized several

-3-

defendants guilty of all charged offenses. The district court then sentenced Thomas to a prison term of 240 months. Maxwell received a term of 124 months. Gregg received a 324 month term of imprisonment. The district court sentenced Sanchez to a prison term of 240 months, and Hodgkiss to life imprisonment. The defendants now appeal their convictions and sentences.

## II

### *Joint Claims*

### A

All five defendants generally argue that the evidence proved the existence not of the single conspiracy alleged in the indictment, but of multiple conspiracies. Gregg specifically argues that there was a "material variance" between the single conspiracy alleged in the indictment and the multiple conspiracies proved by the government at trial. A conspiracy is "an agreement by two or more persons to commit one or more unlawful acts and an overt act by one of the conspirators in furtherance of the conspiracy." *United States v. Romeros*, 600 F.2d 1104, 1106 (5th Cir. 1979), *cert. denied*, 444 U.S. 1077, 100 S. Ct. 1025, 62 L. Ed. 2d 759 (1980). A conspiracy conviction must be upheld if any reasonable trier of fact could find beyond a reasonable doubt that "a conspiracy existed, that each co-defendant knew of the conspiracy, and that each co-defendant voluntarily joined it." *United States v. Simmons*, 918 F.2d 476, 483-84 (5th Cir. 1990)

hand scales, firearms, and a cocaine grinder.

(internal quotation omitted). "No evidence of overt conduct is required. A conspiracy agreement may be tacit, and the trier of fact may infer agreement from circumstantial evidence." *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1988).

"In general, once an indictment has been returned, its charges may not be broadened through amendment except by the grand jury." *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606 (5th Cir. 1991). A material variance occurs when a variation between proof and indictment occurs, but does not modify an essential element of the offense charged. *Id.* "With variance, our concern is whether the indictment, assuming it has otherwise alleged the elements of the offense, has so informed a defendant that he can prepare his defense without surprise and has protected him against a second prosecution for the same offenses." *United States v. Cochran*, 697 F.2d 600, 604 (5th Cir. 1983). If a material variance occurs, we determine whether the defendant has been prejudiced by it using the harmless error analysis. *United States v. Lokey*, 945 F.2d 825, 832 (5th Cir. 1991).

Whether the evidence, or the reasonable inferences drawn therefrom, proved one or more conspiracies turns on the following elements: (1) the time period involved, (2) the persons acting as co-conspirators, (3) the statutory offenses charged in the indictment, (4) the nature and scope of the criminal activity, and (5) the places where the events alleged as the conspiracy took place. *Lokey*, 945 F.2d at 831; *United States v. Devine*, 934 F.2d

-5-

1325, 1333 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 954, 117 L. Ed. 2d 120 (1992).  Here, the jury was presented with evidence from which it could reasonably infer that the defendants were involved in a single conspiracy between 1986 and 1989.  For example, Clark and Curtis both testified that they delivered drugs at Hodgkiss's direction to Thomas and Sanchez during the relevant time period.  Curtis also testified that he obtained his "job" with Hodgkiss through Alan Gardner, who often would collect the proceeds of drug sales from Curtis for Hodgkiss.  Moreover, Gardner would inform Curtis of the pick-up locations for methamphetamine that Hodgkiss purchased.  Additionally, Clark testified that John Rogala and Patrick Palmer set up the Smithville methamphetamine laboratory at Hodgkiss's direction and that Rogala brought the methamphetamine produced at the laboratory to Clark for distribution pursuant to Hodgkiss's directions.  Palmer stated that Rogala introduced him to Hodgkiss and that Hodgkiss and Rogala jointly reimbursed him for expenses he incurred while leasing the Smithville property.  Edward Crawford, who oversaw the manufacture of methamphetamine for Hodgkiss, testified that he was paid for his services by Hodgkiss through Gardner.  Donald Copeland testified that Rogala and Hodgkiss attempted to smuggle a large quantity of marijuana into the United States from Mexico.  Gardner testified that he often purchased narcotics from Hodgkiss and that Hodgkiss knew Gardner would be distributing the drugs to others, including Maxwell. Richard Townsen, one of Rogala's employees, testified that Gregg

-6-

delivered up to fifteen kilograms of cocaine to him, many of which Rogala then delivered to Hodgkiss. Finally, Norman Allanson testified that Gregg transported fifteen kilograms of cocaine that Rogala had purchased from Florida to Texas.

Nonetheless, the defendants assert that because they did not know the identity of other members of the Hodgkiss conspiracy, they could not be guilty of conspiring with them. However, a jury may find a defendant guilty of conspiring with unknown persons where a sufficient overlap of personnel occurs))i.e., "if a pivotal figure, such as [Hodgkiss], directs and organizes the illegal activity, and has extensive dealings with each of the parties." *Lokey*, 945 F.2d at 833. Thus, "[p]arties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy," even in the absence of contact with other conspirators. *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987) (internal quotation omitted). Therefore, as noted, the jury's conclusion that Hodgkiss, Gregg, Sanchez, Thomas, and Maxwell were co-conspirators was reasonable in light of the evidence presented at trial.

Moreover, the jury reasonably could have inferred from the evidence that the defendants had a common goal of distributing illegal drugs for profit, that they knew they were part of a larger venture, and that the activities of each conspirator were advantageous to the success of the overall venture:

> Where the activities of one aspect of the scheme are
> necessary or advantageous to the success of another

> aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, or where the character of the property involved or nature of the activity is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants, the existence of a single conspiracy will be inferred.

*United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982). "[I]n many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture." *Lokey*, 945 F.2d at 831 (internal quotation omitted). The jury reasonably could have found that the defendants were part of a single conspiracy: Gregg as a supplier, Hodgkiss as a wholesaler, and Thomas, Maxwell, and Sanchez as retailers. Thus, we find that the jury convicted the defendants only of the single conspiracy charged, not the multiple conspiracies defendants allege existed.[4]

---

[4] In fact, the district court specifically instructed the jury that

> [i]f you find that the conspiracy charged did not exist, then you must return a not guilty verdict as to each Defendant . . . , even though you find that some other conspiracy or conspiracies existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that Defendant not guilty, even though the Defendant may have been a member of some other conspiracy.

This instruction, which substantially tracks our *Pattern Jury Instructions*, does not permit the jury to convict the defendants for crimes not charged in the indictment. *See Zafiro v. United States*, ___ U.S. ___, 113 S. Ct. 933, 939, 122 L. Ed. 2d 317 (1993) (noting that "`juries are presumed to follow their instructions'") (quoting *Richardson v. Marsh*, 481 U.S. 200, 209, 107 S. Ct. 1702, 1708, 95 L. Ed. 2d 176 (1987)).

Finally, even if the evidence did prove the existence of multiple conspiracies, the defendants, to obtain reversal, still must demonstrate that the variance affected their substantial rights. Here, we find that the indictment sufficiently informed the defendants of the offenses charged and that they were not surprised at trial. *See Cochran*, 697 F.2d at 604. Nor were the convictions based upon a "set of facts distinctly different from that set forth in the indictment." *United States v. Chandler*, 858 F.2d 254, 257 (5th Cir. 1988) (internal quotation omitted). Accordingly, if any material variance occurred, we find that it was harmless error. *See Lokey*, 945 F.2d at 834; *see also United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992) ("[W]hen the indictment alleges the conspiracy count as a single conspiracy, but the `government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights.'") (citation omitted), *cert. denied*, ___ U.S. ___, 113 S. Ct. 2429, 124 L. Ed. 2d 649 (1993).

**B**

The defendants contend that the evidence was insufficient to support their respective convictions for various drug-related offenses. However, they failed to move for a judgment of acquittal at the close of their cases.[5] Accordingly, we restrict our review

---

[5] Maxwell and Gregg moved for a judgment of acquittal at the close of the government's case, but not at the close of their cases.

of their claims to whether their convictions resulted in a manifest miscarriage of justice. *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir.), *petition for cert. filed* (1993); *United States v. Galvan*, 949 F.2d 777, 782 (5th Cir. 1991). "Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . [if] the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Galvan*, 949 F.2d at 782-83 (citations omitted). "In making this determination, the evidence, as with the regular standard for review of insufficiency of evidence claims, must be considered `in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices.'" *United States v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988) (quoting *Hernandez-Palacios*, 838 F.2d at 1348). Moreover, "[o]nly slight evidence is needed to connect an individual to an illegal conspiracy once the [government] has produced evidence of that conspiracy." *Vaquero*, 997 F.2d at 82.

**1**

Maxwell contends that the evidence is insufficient to support his conviction for conspiracy to possess controlled substances with intent to distribute. However, Alan Gardner))who at one time supplied Hodgkiss with drugs but later began purchasing drugs at wholesale prices from Hodgkiss))testified that he began selling cocaine to Maxwell in March 1988. Gardner stated that although Maxwell usually purchased two ounces of uncut cocaine every other

-10-

week, Maxwell on occasion would order up to four ounces. Moreover, Gardner normally "fronted"[6] the cocaine to Maxwell. Gardner employee Charles Barton corroborated Gardner's testimony. Ronald McWilliams, who at one time supplied cocaine to Maxwell, testified that he purchased cocaine from Maxwell on two occasions in 1989.

The jury could have concluded from this evidence that Maxwell was a member of the Hodgkiss conspiracy. Maxwell received uncut cocaine from Gardner, who purchased cocaine from Hodgkiss with Hodgkiss's knowledge that the cocaine would be resold. Moreover, Gardner also fronted the cocaine to Maxwell, allowing the jury to infer that Maxwell was acting as a retailer of the cocaine. This inference is supported by the testimony of McWilliams, who stated that he purchased cocaine from Maxwell on two occasions. Accordingly, Maxwell's conviction did not result in a manifest miscarriage of justice.

**2**

Gregg also argues that the evidence did not support his conviction for conspiracy to possess with intent to distribute. However, Richard Townsen, who worked for Rogala, testified that on several occasions Gregg delivered multiple kilograms of cocaine to

---

[6]      "The term `fronted' refers to a transfer of drugs in which one person transfers the drugs to a second person in return for the second person's promise to pay the sales price within a few days." *United States v. Alfaro*, 919 F.2d 962, 963 (5th Cir. 1990); *see also United States v. Chase*, 838 F.2d 743, 746 (5th Cir.) (defining "fronted" to mean "delivered on consignment"), *cert. denied*, 486 U.S. 1035, 108 S. Ct. 2022, 100 L. Ed. 2d 609 (1988). Thus, the jury may reasonably infer that if a person has been fronted drugs, that person likely is a dealer who intends to sell all or a portion of the drugs in order to pay the drug supplier.

him that had been purchased by Rogala. Pursuant to instructions from Rogala, Townsen would park his truck at a specified location and then "disappear" for a couple of hours. Gregg, who obtained the keys to Townsen's truck from Rogala, would place the cocaine in the truck during Townsen's absence. Norman Allanson testified that he sold cocaine to Rogala and Grey Hayes.[7] On one occasion, Gregg transported eight kilograms of cocaine from Florida to Texas for Rogala. On a second occasion, Gregg transported seven kilograms from Florida to Texas for Rogala. On a third occasion, Gregg transported a sizable quantity of marijuana to Florida, picked up five kilograms of cocaine from Allanson, but sold some of the cocaine in Florida when he was not able to sell the marijuana. Consequently, viewing the evidence in the light most favorable to the government, Gregg's conviction did not result in a manifest miscarriage of justice. *See United States v. Greenwood*, 974 F.2d 1449, 1457 (5th Cir. 1992) (noting that "common sense dictates that someone ultimately would be responsible for distributing the various . . . loads of marijuana which [the defendant] had helped smuggle into the United States"), *cert. denied*, ___ U.S. ___, 113 S. Ct. 2354, 124 L. Ed. 2d 262 (1993); *United States v. Pineda-Ortuno*, 952 F.2d 98, 102 (5th Cir.) (noting that intent to distribute may be inferred from the fact that the defendant possessed "a larger quantity of cocaine than an ordinary user would

---

[7]     Townsen testified that Grey Hayes and Gregg were "partners" and that Rogala purchased cocaine from Hayes. Allanson stated that he had been selling cocaine to Gregg and Hayes for approximately ten years before his arrest.

-12-

possess for personal consumption"), *cert. denied*, ___ U.S. ___, 112 S. Ct. 1990, 118 L. Ed. 2d 587 (1992).

**3**

Thomas contends that the evidence was insufficient to support his conspiracy conviction. Curtis, however, testified that while he worked for Hodgkiss, he delivered one to two ounce quantities of controlled substances to Thomas twice a week. Clark testified that, pursuant to instructions given to him by Hodgkiss, he gave both drugs and records of drug sales to Thomas for delivery to Hodgkiss. Moreover, Clark stated that he delivered controlled substances to Thomas on several occasions, and Hodgkiss assigned a code number to Thomas to facilitate the distribution of narcotics.[8] As with Gregg, we find that this evidence is sufficient to support Thomas's conviction for conspiring to possess a controlled substance with intent to distribute.

**4**

Sanchez contends that the evidence was insufficient to support his conviction for money laundering, in violation of 18 U.S.C. § 1956. To establish a violation of this section, the government must prove that Sanchez (1) knowingly conducted a financial

---

[8] Thomas further argues that the government did not establish the identity of "07" because the government's "entire case was based on circumstantial evidence." However, the government may use circumstantial evidence to establish the identity of a conspirator. *See Hernandez-Palacios*, 838 F.2d at 1348 (allowing the jury to infer that a defendant voluntarily joined a conspiracy from circumstantial evidence). Moreover, Clark testified that Thomas was "07" and Curtis testified that he delivered cocaine to Thomas on a regular basis. Thus, the evidence supports the jury's finding that Thomas was "07."

transaction[9] (2) that involved the proceeds of an unlawful activity (3) with the intent to promote or further that unlawful activity. *United States v. Salazar*, 958 F.2d 1285, 1293 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 185, 121 L. Ed. 2d 129 (1992). Sanchez argues that the evidence supporting his conviction is insufficient because it consists only of "government agents piecing together some written materials seized during drug raids which materials purportedly referenced [Sanchez] selling marijuana to someone unknown in the Hodgkiss organization."  We disagree.

Clark testified that Sanchez, whose code number was "06," delivered ten to fifteen pound quantities of marijuana to Clark "more than once."  Clark stated that these transactions would be reflected in the drug ledgers seized from his residence.  Officer Philip Steen testified that Clark's drug ledgers showed that Clark received fifteen pounds of marijuana from and paid $8,800 to Sanchez in March 1988.  Steen also stated that a similar sale occurred in April 1988 and that Sanchez was paid with money derived from drug sales.  As Clark was a member of the Hodgkiss conspiracy and the drug ledgers reflected the movement of drug proceeds from Clark to Sanchez, the evidence supports the jury's conclusion that Sanchez was guilty of money laundering.

---

[9]     A "financial transaction" is defined as "the movement of funds by wire or other means or . . . one or more monetary instruments" that "in any way or degree affects interstate or foreign commerce."  18 U.S.C. § 1956(c)(4).

**5**

**a**

Hodgkiss first argues that the evidence is insufficient to support his conviction for engaging in a CCE, in violation of 21 U.S.C. § 848, because he did not organize, supervise, or otherwise manage five participants in his drug-trafficking conspiracy.[10] Hodgkiss, however, admits in his brief that he supervised three persons))Aaron Clark, Robbie Curtis, and Gina Raven, Hodgkiss's girlfriend.[11] Thus, the question before us is whether the evidence supports a finding that Hodgkiss supervised two additional participants in the conspiracy.

Edward Crawford, who has a doctorate in chemistry, testified that, for the sum of $25,000, he manufactured methamphetamine for Hodgkiss and, at Hodgkiss's direction, instructed two other persons))"Jake" and Patrick Palmer))"in the art and science of manufacturing methamphetamine." Crawford, Jake, and Palmer used chemicals obtained from Wesley Schneider to produce approximately

---

[10]     Section 848(c) provides that a person engages in a CCE if:

 (1) he violates any provision of [title 21] the punishment for which is a felony, and
 (2) such violation is part of a continuing series of violations of [title 21]))

        (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
        (B) from which such person obtains substantial income or resources.

[11]     Hodgkiss conceded at oral argument that he "probably" supervised a fourth person))Edward Crawford.

twenty-four pounds of methamphetamine at a "meth lab" near Smithville, Texas. Thus, the jury reasonably could infer from Crawford's testimony that Hodgkiss directed Crawford, Jake, and Palmer.[12] Consequently, examining the evidence in the light most favorable to the government and giving the government the benefit of all reasonable inferences and credibility choices, we find that Hodgkiss managed at least five persons within the meaning of the statute.[13]

**b**

Hodgkiss also appeals his conviction for using or carrying a machine gun in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).[14] Hodgkiss argues that the firearm

---

[12] Moreover, Palmer testified that Hodgkiss directed him to find a suitable location for a methamphetamine lab. Palmer then found the Smithville site, leased it in his own name with his own funds, and subsequently was reimbursed by John Rogala and Hodgkiss. After Crawford and Palmer manufactured one batch of methamphetamine, Hodgkiss instructed Palmer to place the remaining chemicals and lab equipment in storage.

[13] Because we find that Hodgkiss organized, supervised, or managed Crawford and Palmer, we need not discuss whether Hodgkiss managed anyone else. However, we note that substantial evidence indicates that Hodgkiss likely managed several other persons at various times during the conspiracy's existence. *See United States v. Phillips*, 664 F.2d 971, 1034 (5th Cir. Unit B 1981) (noting that "the requisite five persons need not have acted in concert at the same time"), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L. Ed. 2d 1354 (1982).

[14] This section provides that

[w]hoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced . . . if the firearm is a machine gun . . . to imprisonment for thirty years.

18 U.S.C. § 924(c)(1). "The term `machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

alleged by the government to be a machine gun actually was not such a weapon, that he did not "use or carry" the machine gun within the meaning of the statute, and that the district court erred in not granting a judgment of acquittal on the machine gun count. We disagree with all three contentions.

## (i)

Hodgkiss initially argues that the AR-15 rifle found in his house by government agents was not a machine gun within the meaning of § 924(c)(1). However, two expert witnesses))Bureau of Alcohol, Tobacco, and Firearms agents Davy Aguilera and Geoffrey Descheemaeker))testified that the weapon had been altered to fire as a machine gun. Thus, the evidence sufficiently supported the jury's conclusion that the weapon at issue was a machine gun.[15] *See Greenwood*, 974 F.2d at 1458 ("Assessing the credibility of witnesses . . . is the exclusive province of the jury.").

## (ii)

Hodgkiss next contends that he did not "use or carry" the firearm within the meaning of the statute because the machine gun was unloaded and stored in a zippered gun bag in a second-floor closet. The presence of firearms at the home of a defendant where drugs, money, and ammunition are also found, however, is sufficient to establish the "use" of a firearm as an integral part of a drug-trafficking crime in violation of § 924(c). *See United States v.*

---

[15] Interestingly, Hodgkiss's attorney conceded during closing argument that the weapon was a machine gun: "I started out trying to downplay the fact that it was a machine gun. But after [Descheemaeker] got on, I just))he just backed me down. I))it's a machine gun, I give up."

*Robinson*, 857 F.2d 1006, 1010 (5th Cir. 1988). "The fact that a weapon is `unloaded' or `inoperable' does not insulate the defendant from the reach of section 924(c)(1)." *United States v. Contreras*, 950 F.2d 232, 241 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 2276, 119 L. Ed. 2d 202 (1992); *see also Reed v. Butler*, 866 F.2d 128 (5th Cir.) (discussing the dangerousness of unloaded or inoperable firearms), *cert. denied*, 490 U.S. 1050, 109 S. Ct. 1963, 104 L. Ed. 2d 431 (1989). "Moreover, this Court has held that the Government is only obliged to show that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking; a showing that the weapon was used, handled or brandished in an affirmative manner is not required." *United States v. Molinar-Apodaca*, 889 F.2d 1417, 1424 (5th Cir. 1989); *see also United States v. Blake*, 941 F.2d 334, 342 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 113 S. Ct. 596, 121 L. Ed. 2d 533 (1992).

Agents seized from Hodgkiss's house the machine gun, ammunition for it, other firearms, coded drug ledgers, a small amount of methamphetamine, and over $20,000 in cash. Don Howell, the stepfather of Hodgkiss's girlfriend, Gina Raven, testified that Hodgkiss on one occasion stated that he needed the weapon for protection because of "his line of business."[16] *See United States v. Martinez*, 808 F.2d 1050, 1057 (5th Cir.) ("Firearms are `tools

_____

[16] Hodgkiss previously told Howell that "his business" involved supplying money to people for drug deals.

of the trade' of those engaged in illegal drug activities."), *cert. denied*, 481 U.S. 1032, 107 S. Ct. 1962, 95 L. Ed. 2d 533 (1987). Based upon the record evidence, the jury was entitled to conclude based that Hodgkiss used the machine gun in relation to a drug-trafficking offense.  *See, e.g.*, *United States v. Capote-Capote*, 946 F.2d 1100, 1104 (5th Cir. 1991) (machine gun found with a loaded clip beside it in a closed drawer of a chest on the second floor of an apartment facilitated a drug transaction), *cert. denied*, ___ U.S. ___, 112 S. Ct. 2278, 119 L. Ed. 2d 204 (1992); *United States v. Coburn*, 876 F.2d 372, 375 (5th Cir. 1989) (unloaded shotgun in gun rack of vehicle containing marijuana violated § 924(c) even though no shells were found in the vehicle).

### (iii)

Hodgkiss finally contends that the district erred in denying his post-trial motion for a judgment of acquittal on the machine gun count, which defined the predicate drug trafficking crime required by § 924(c) to be the conspiracy alleged in count two of the indictment.  Hodgkiss argues that because he was acquitted of the conspiracy upon which the § 924(c) violation was predicated, he could not have been guilty of a § 924(c) violation.[17]

Hodgkiss misinterprets the requirements of § 924(c).  "[T]here is no statutory requirement that the government secure an

_____

[17] Although the jury found Hodgkiss guilty of the conspiracy alleged in count two, the district court entered a judgment of acquittal on that count because the jury also found Hodgkiss guilty of engaging in a continuing criminal enterprise, of which conspiracy is a lesser-included offense.  *See Devine*, 934 F.2d at 1342 (noting that "a § 846 conspiracy is a lesser-included offense of a § 848 continuing criminal enterprise").

underlying drug-trafficking *conviction* as a predicate for invoking section 924(c)(1)." *United States v. Munoz-Fabela*, 896 F.2d 908, 909 (5th Cir.), *cert. denied*, 498 U.S. 824, 111 S. Ct. 76, 112 L. Ed. 2d 49 (1990). Instead, "it is only the fact of the offense, and not a conviction, that is needed to establish the required predicate." *Id.* at 911; *see also United States v. Ruiz*, 986 F.2d 905, 911 (5th Cir.) (acquittal on the predicate count does not preclude a conviction under § 924(c) if a reasonable jury could have found the defendant guilty of the predicate act), *cert. denied*, ___ U.S. ___, 114 S. Ct. 145, 126 L. Ed. 2d 107 (1993). Thus, the jury's finding that Hodgkiss engaged in a conspiracy to distribute illegal drugs qualifies as a drug-trafficking offense under § 924(c), and is more than sufficient to support Hodgkiss's conviction. Accordingly, the district court did not err in refusing to enter a judgment of acquittal.

### C

Sanchez and Hodgkiss contend that the district court erred in denying their motions for severance under Fed. R. Crim. P. 14. Sanchez contends that he was entitled to a severance because he had only a minimal involvement in the conspiracy, the jury was "simply overwhelmed" by the volume of evidence, and evidence admissible against other defendants was inadmissible as to him. Hodgkiss argues that he was entitled to severance because evidence was admissible against other defendants but inadmissible against him

and his defense strategy conflicted with that of at least one of his co-defendants.[18]

Denial of a motion for severance is reviewable only for an abuse of discretion. *Zafiro v. United States*, ___ U.S. ___, 113 S. Ct. 933, 939, 122 L. Ed. 2d 317 (1993); *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). "Reversal is warranted only when the [defendant] can demonstrate compelling prejudice against which the trial court was unable to afford protection." *Arzola-Amaya*, 867 F.2d at 1516. "The rule, rather than the exception, is that persons indicted together should be tried together, especially in conspiracy cases." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 266, 126 L. Ed. 2d 218 (1993). Accordingly, a quantitative disparity in the evidence "is clearly insufficient in itself to justify severance." *United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir.), *cert. denied*, 474 U.S. 1034, 106 S. Ct. 599, 88 L. Ed. 2d 578 (1985). Moreover, "the mere presence of a spillover effect does not ordinarily warrant severance." *United States v. Sparks*, 2 F.3d 574, 583 (5th Cir. 1993). Finally,

---

[18] Sanchez and Hodgkiss further allege that the indictment incorrectly charged a single conspiracy, thus demonstrating that joinder was initially incorrect under Fed. R. Crim. P. 8(b). In such cases, the defendants, to obtain a reversal of their convictions, need only establish that the misjoinder resulted in "actual prejudice." *United States v. Lane*, 474 U.S. 438, 449, 106 S. Ct. 725, 732, 88 L. Ed. 2d 814 (1986). However, we already have found that the evidence supported the jury's verdict that a single conspiracy existed. *See* part II.A. *supra*. Consequently, the *Lane* test is inapplicable. *See also United States v. Piaget*, 915 F.2d 138, 142 (5th Cir. 1990) (stating that Rule 8(b) "is to be broadly construed in favor of initial joinder").

severance is not required merely because co-defendants present mutually antagonistic defenses: "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district court." *Zafiro*, 113 S. Ct. at 938-39.

In this case, the government offered sufficient evidence demonstrating that Sanchez and Hodgkiss were guilty of the crimes charged. *See* parts II.B.4 and .5 *supra*. Moreover, even if some risk of prejudice existed, the district court properly instructed the jury to limit evidence to the appropriate defendant,[19] and "`juries are presumed to follow their instructions.'" *Zafiro*, 113 S. Ct. at 939 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209, 107 S. Ct. 1702, 1708, 95 L. Ed. 2d 176 (1987)). Sanchez and Hodgkiss provide no sound reason for departing from this principle. Because Sanchez and Hodgkiss did not suffer compelling prejudice against which the district court was unable to afford protection, the district court did not abuse its discretion in refusing to sever their cases.

---

[19] In addition to the multiple conspiracy instruction, *see* note 4 *supra*, the district court gave the following instruction:

> In determining whether a Defendant was a member of the alleged conspiracy, . . . you should consider only the evidence, if any, pertaining to his own acts and statements. He is not responsible for the acts or declarations of other alleged participants until it is established beyond a reasonable doubt first that a conspiracy existed, and second, that the Defendant was one of the members.

The district court also instructed the jury that the defendants were not "on trial for any act, conduct or offense or offenses not alleged in the superseding indictment."

Sanchez and Hodgkiss next contend that the district court's denial of their requests for production of notes prepared by federal agents who debriefed several plea-bargaining defendants violated both the Jencks Act, 18 U.S.C. § 3500,[20] and the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963).[21]  The government contends that the debriefing notes are neither Jencks Act nor *Brady* material.

Under the Jencks Act, a "statement" is (1) a written statement signed or otherwise adopted or approved by the witness, or (2) a "substantially verbatim recital" of an oral statement made by the witness.  18 U.S.C. § 3500;  *United States v. Pierce*, 893 F.2d 669, 675 (5th Cir. 1990).  An agent's interview notes thus are not "statements" of the witnesses interviewed unless the witnesses "signed, read, or heard the entire document read."  *Pierce*, 893 F.2d at 675.  Although the defendants thoroughly cross-examined

---

[20]     This section provides in relevant part:

    (b)  After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

[21]     In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S. Ct. at 1196-97.

each of the government witnesses, they were unable to produce any evidence that one of these three conditions was met. *See id.* Similarly, there is no evidence that any portion of the notes was a substantially verbatim transcription of the witness's statements. Thus, the notes are not discoverable under the Jencks Act as statements of the plea-bargaining defendants.[22] *United States v. Mora*, 994 F.2d 1129, 1138 (5th Cir.), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___ (1993); *United States v. Ramirez*, 954 F.2d 1035, 1038 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 3010, 120 L. Ed. 2d 884 (1992).

The defendants also contend that the notes constitute *Brady* material because they contain either exculpatory evidence or evidence useful for impeachment purposes. Prior to trial, the defendants requested from the government any *Brady* evidence. The district court denied their motions as moot in light of the government's assurances that all Jencks and *Brady* material would be produced. During trial, however, the defendants discovered that the government failed to produce the notes made by agents during debriefing sessions with the plea-bargaining defendants. The government contends that the debriefing notes did not have to be produced because they contained no exculpatory or otherwise useful information. The record is unclear as to whether the district

---

[22]     Although the district court addressed the issue whether the notes constituted Jencks Act statements of the plea-bargaining defendants, the court did not discuss whether the notes constituted Jencks Act statements of the testifying agents. *See* note 25 *infra*.

court reviewed in camera all or just a portion of the notes sought by the defendants.[23]  Moreover, the record is unclear as to the exact findings of the district court regarding the material reviewed in camera by the court.[24]

Accordingly, rather than determine ourselves whether the government should have produced the notes pursuant to the *Brady* doctrine))i.e., whether the notes contain evidence material either to guilt or punishment))we remand this matter to permit the district court to make such a determination in the first instance. *United States v. Gaston*, 608 F.2d 607, 614 (5th Cir. 1979); *see also United States v. Welch*, 810 F.2d 485, 491 (5th Cir. 1987) (similar remedy with respect to Jencks Act); *United States v. Hogan*, 763 F.2d 697, 704 (5th Cir. 1985) (same).  If the district court concludes that the notes need not have been produced, it should supplement the record with the notes and with sufficiently detailed findings to enable us to review the decision.  *Welch*, 810

---

[23]     The government contends that the district court reviewed all debriefing notes prepared by government agents.  The record, however, indicates that the government produced only two sets of notes))one for the debriefing sessions of Alan Gardner and one for witness Don Howell.  Moreover, only the notes related to Gardner are included in the record on appeal.

[24]     The district court reviewed in camera the notes from Gardner's debriefing sessions.  The court then denied Maxwell's motion for production of the notes, thereby implying that the notes contained no *Brady* material.  However, in denying Maxwell's motion, the court remarked that "to say there is no exculpatory or *Brady* material in that would be to engage in severe *overstatement*." (Emphasis added).  While the district court may have merely misstated his conclusion, the exact import of its ruling is unclear in these circumstances.

F.2d at 491; *Gaston*, 608 F.2d at 614. If the defendants contest the district court's findings, they need not file a new appeal. "They may, instead, lodge with this court certified copies of the trial court's findings and, if needed, supplementary briefs or other materials. This matter will be referred to this panel." *Welch*, 810 F.2d at 491. If the district court concludes that any portion of the notes should have been produced, it then should determine whether the government's failure to furnish the notes amounts to a due process violation))i.e., whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985). Unless the district court is persuaded that the result of the proceeding would not have been different, it should vacate the judgment of conviction and grant a new trial.[25] *Welch*, 810 F.2d at 491; *Gaston*, 608 F.2d at 614.

## III

### *Jerry Thomas Maxwell*

Maxwell contends that the trial judge should have given to the jury the "buyer-seller" instruction that he requested. This

---

[25] Because we remand this matter the district court, we need not address the defendants' additional contention that the notes constitute Jencks Act statements of the testifying agents. Notes taken by an agent during witness interviews can constitute statements of the agent under the Jencks Act, even if the notes do not constitute statements of the witnesses. *See United States v. Sink*, 586 F.2d 1041, 1051 (5th Cir. 1978) (finding an agent's report, prepared from his notes and recollections from witness interviews, to be a statement of the agent), *cert. denied*, 443 U.S. 912, 99 S. Ct. 3102, 61 L. Ed. 2d 876 (1979). The government did not brief, and the district court did not address, this claim. On remand, the district court also should evaluate this claim.

instruction, apparently based on *United States v. Hughes*, 817 F.2d 268, 273 (5th Cir.), *cert. denied*, 484 U.S. 858, 108 S. Ct. 170, 98 L. Ed. 2d 124 (1987), directed the jury to acquit Maxwell if they believed that he received cocaine "for his own personal use and not to facilitate the conspiracy or because he was a member of the conspiracy."  The government argues that the essence of Maxwell's proposed instruction was substantially covered by the charge actually given to the jury.  We agree.

The district court's refusal to give a requested instruction is reviewed for an abuse of discretion.  *United States v. Sellers*, 926 F.2d 410, 414 (5th Cir. 1991).  Under this standard of review, the district court has "substantial latitude in tailoring instructions so long as they fairly and adequately cover the issues presented," *United States v. Pool*, 660 F.2d 547, 558 (5th Cir. Unit B Nov. 1981), and is "under no obligation to give a requested instruction that misstates the law, is argumentative, or has been adequately covered by other instructions."  *United States v. L'Hoste*, 609 F.2d 796, 805 (5th Cir.), *cert. denied*, 449 U.S. 833, 101 S. Ct. 104, 66 L. Ed. 2d 39 (1980).

"While it is true that a buyer-seller relationship, without more, will not prove a conspiracy, evidence of such activity goes to whether the defendant intended to join in the conspiracy or whether his or her participation was more limited in nature." *United States v. Maserati*, 1 F.3d 330, 336 (5th Cir. 1993). Accordingly, the drug conspiracy laws focus exclusively on the

question "whether the participants knowingly joined an agreement to distribute drugs in violation of the law." *Id.* Therefore, if the evidence demonstrates only that someone purchased drugs from the conspiracy and did not agree to join it, "the elements necessary to prove a conspiracy would be lacking, and a not guilty verdict would result." *Id.* In this case, the district court, using our *Pattern Jury Charge*, accurately instructed the jury on the law of conspiracy, and the jury found Maxwell guilty of conspiring to distribute drugs. Thus, the jury, by rendering a guilty verdict, specifically found that Maxwell agreed to join the conspiracy. We therefore find that Maxwell's theory was adequately covered by the instructions, and the district court did not abuse its discretion in refusing to give the requested instruction. *See id.; L'Hoste*, 609 F.2d at 805.[26]

## IV

### *Steven Darrel Gregg*

### A

Gregg argues that the district court incorrectly denied his motion to suppress evidence seized during the search of an automobile he was driving. Gregg contends that the police officer who searched the vehicle lacked probable cause to do so, thus

---

[26] Hodgkiss argues that the district court erred in refusing to instruct the jury that they had to unanimously agree on the identity of the five individuals whom Hodgkiss managed as part of the CCE. However, as Hodgkiss noted at oral argument, the jury need not unanimously agree on the identities of the five individuals. *United States v. Linn*, 889 F.2d 1369, 1374 (5th Cir. 1989), *cert. denied*, 498 U.S. 809, 111 S. Ct. 43, 112 L. Ed. 2d 19 (1990). The district court thus did not abuse its discretion in rejecting the proposed instruction.

making the seized evidence the fruit of an illegal search.  The government argues that the officer had probable cause to search the vehicle and that Gregg abandoned the bag in which the officer found the contraband, thereby barring Gregg from challenging the legality of the search.

"In reviewing a district court's ruling on a motion to suppress evidence based on testimony at a suppression hearing, we must accept the district court's factual findings unless they are clearly erroneous or are influenced by an incorrect view of the law." *United States v. Garcia*, 849 F.2d 917, 917 n.1 (5th Cir. 1988).  "Further, we must view the evidence in the light most favorable to the party that prevailed below."  *Id.*  However, we review de novo the ultimate conclusion drawn from the district court's factual finding.  *United States v. Diaz*, 977 F.2d 163, 164 (5th Cir. 1992).

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effect, against unreasonable searches and seizures shall not be violated." Evidence obtained by the government in violation of a defendant's Fourth Amendment rights may not be used to prove the defendant's guilt at trial. *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346, 58 L. Ed. 652 (1914).  In *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the Supreme Court stated that where there is a reasonable and articulable suspicion that a person has committed a crime, a limited search and seizure is not

unreasonable. Thus, if the detaining officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure]," the intrusion is lawful. *Id.* at 21, 88 S. Ct. at 1880.

Mississippi Deputy Sheriff Billy Collins initially stopped the vehicle Gregg was driving because the automobile was weaving between lanes. Thus, the initial detention was proper under *Terry* because Collins had reasonable and articulable facts that warranted the intrusion))Gregg had violated traffic laws. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993); *United States v. Kye Soo Lee*, 898 F.2d 1034, 1040 (5th Cir. 1990). After Gregg was initially detained, however, Collins was presented with a second set of circumstances that, in our opinion, justified Gregg's continued detention. This second set of facts included the smell of marijuana emanating both from Gregg's person and from the vehicle, Gregg's deception regarding whether he had ever been arrested,[27] and that Gregg was not the registered owner of the vehicle. These factors gave Collins probable cause to believe that the vehicle contained contraband, thus giving him the right to search the vehicle. *See United States v. Ryles*, 988 F.2d 13, 14 n.2 (5th Cir.) (noting that an officer's "smelling marijuana afford[s] probable cause to engage in a warrantless search" of a

---

[27] While running routine computer checks during the traffic stop, Collins asked Gregg whether he had ever been arrested, and Gregg replied that he had not. *See Shabazz*, 993 F.2d at 437 (finding that an officer may lawfully ask questions of traffic-stop detainees while waiting for the results of computer checks). However, Collins discovered via the computer checks that Gregg previously had been arrested in Florida for a drug-related offense.

vehicle), *cert. denied*, ___ U.S. ___, 114 S. Ct. 168, 126 L. Ed. 2d 128 (1993); *United States v. Piaget*, 915 F.2d 138, 140 (5th Cir. 1990) ("A warrantless search of an automobile is permissible where officers have probable cause to believe the vehicle contains contraband.").

Gregg nevertheless contends that because Collins did not have probable cause to search the camera bag in which Collins found marijuana and cocaine, the evidence should be suppressed. However, Gregg ignores the fact that he abandoned the camera bag. When Collins asked Gregg who owned the bag, Gregg shrugged his shoulders and stated that he did not know.[28] Gregg thus abandoned the bag, allowing Collins to examine its contents. *Piaget*, 915 F.2d at 140; *Garcia*, 849 F.2d at 919; *United States v. Canady*, 615 F.2d 694, 697 (5th Cir.), *cert. denied*, 449 U.S. 862, 101 S. Ct. 165, 66 L. Ed. 2d 78 (1980). "Once a bag has been abandoned, and the abandonment is not a product of improper police conduct, the defendant cannot challenge the subsequent search of the bag." *Piaget*, 915 F.2d at 140. As Collins had probable cause both to stop Gregg's vehicle and to search it, Gregg could not have abandoned the bag as result of improper police conduct. Consequently, we find no error in the district court's denial of Gregg's motion to suppress.

---

[28] Gregg appears to challenge the district court's decision to credit the testimony of officer Collins over that of Gregg. However, we must give due deference to the credibility determinations of the district court, who has the opportunity to observe the demeanor of witnesses. *See Amadeo v. Zant*, 486 U.S. 214, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988).

**B**

Gregg further argues that the prosecutor engaged in prosecutorial misconduct by improperly bolstering the credibility of government witnesses and expressing his personal opinion about the credibility of one government witness during closing arguments. The government contends that the prosecutor simply responded, albeit in a "rhetorically excessive" fashion, to defense counsel's attack on the credibility of the witnesses.

Thomas did not object to the prosecutor's statements that he now contends requires reversal of his conviction. Consequently, we must consider whether the statements were improper and, if so, whether they amounted to plain error under Fed. R. Crim. P. 52(b).[29] *United States v. Hernandez*, 891 F.2d 521, 526 (5th Cir. 1989), *cert. denied*, 495 U.S. 909, 110 S. Ct. 1935, 109 L. Ed. 2d 298 (1990). We must review the allegedly improper argument "in light of the argument to which it responded." *United States v. Canales*, 744 F.2d 413, 424 (5th Cir. 1984). Thus, the government "may even present what amounts to be a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon [the prosecutor] or his witnesses." *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. 1981).

---

[29] Fed. R. Crim. P. 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

During closing arguments, defense counsel contended that the plea bargain agreements between many of the government witnesses and the prosecution invited the witnesses to perjure themselves so as to procure lesser sentences. Specifically, defense counsel argued that Clark, who testified that he was afraid of the prosecutor, lied because of the "Draconian thumb" that the government placed on his neck.[30] The prosecutor, in rebuttal, responded in kind:

> Perhaps I should turn to Aaron Clark and why he is afraid of me. And you know, Ladies and Gentlemen, they're right, Aaron Clark was afraid of me, and I hope he was afraid of me. I hope he remains afraid of me, because he did something that is unforgivable, he lied under oath to you; that isn't tolerable.

As Clark admitted under oath that he lied to the jury with regard to whether he was an employee of Hodgkiss or an "independent contractor," the prosecutor was entitled to comment before the jury on Clark's testimony. Moreover, the prosecutor's statements directly responded to defense counsel's attacks on both the prosecutor and government witnesses who testified pursuant to plea agreements. Accordingly, the comments were not improper and do not constitute plain error under Rule 52(b).

---

[30] Defense counsel also argued that the government first determined what it believed to be the truth and then "put[] the thumbscrew on the witness" to agree with the government's version.

**V**

*Ellis Ray Thomas*

Thomas contends that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel failed to make various objections at trial and also failed to move for a judgment of acquittal following the close of the evidence. Thomas, however, failed to present this issue to the district court.[31]

"The general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been before the district court since no opportunity existed to develop the record on the merits of the allegation." *United States v. Higdon*, 832 F.2d 312, 313-14 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1051, 98 L. Ed. 2d 1013 (1988). If the defendant fails to raise the claim before the district court, we will reach the merits of the claim only if the record is well-developed. *Id.* This is not such a case. As in *United States v. Freeze*, 707 F.2d 132, 139 (5th Cir. 1983),

> [w]hile we might be able to determine, on the basis of the trial record, whether the defendant had been deprived of effective assistance of counsel with regard to the failure to make a motion for judgment of acquittal, we can only speculate about why defense counsel made no objections to the evidence. Accordingly, we decline to reach the merits of the defendant's ineffective assistance claim.

Thomas, of course, may raise this issue in an appropriate proceeding under 28 U.S.C. § 2255. *Id.; see also United States v.*

---

[31] Although Thomas in his brief cited two instances where he raised his claim before the district court, we have reviewed the record without finding any indication that the district court was made aware of Thomas's allegation that his trial counsel was constitutionally ineffective.

*Casel*, 995 F.2d 1299, 1307 (5th Cir.), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___ (1993).

## VI

### *Sentencing*

The defendants appeal the sentences imposed by the district court under the Sentencing Guidelines. We will affirm any sentence imposed by the district court "so long as it results from a correct application of the guidelines to factual findings which are not clearly erroneous." *United States v. Sarasti*, 869 F.2d 805, 806 (5th Cir. 1989). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991).

### A

The defendants initially argue that the district court erred by calculating their sentences on the basis of drug purchases and sales not only by themselves, but also by other co-conspirators.[32]

---

[32] The presentence investigative report ("PSR") found that the Hodgkiss conspiracy distributed over 150 kilograms of cocaine or its equivalent. The PSRs additionally found that Hodgkiss, Thomas, Gregg, and Sanchez each should be held responsible for that amount. The defendants objected to these findings during sentencing. The district court, however, overruled the objections and adopted the PSRs's findings. Hodgkiss, Gregg, and Sanchez now argue that the district court did not comply with Fed. R. Crim. P. 32(c)(3)(D) because it failed to specifically find that they knew or reasonably should have foreseen that the conspiracy would involve over 150 kilograms of cocaine. However, an oral rejection of a defendant's objection to a PSR satisfies the rule. *United States v. Sparks*, 2 F.3d 574, 588 (5th Cir. 1993); *United States v. Stouffer*, 986 F.2d 916, 927 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 115, 126 L. Ed. 2d 80 (1993); *United States v. Lghodaro*, 967 F.2d 1028, 1030 (5th Cir. 1992).

They contend that because they could not have reasonably foreseen that the Hodgkiss conspiracy would involve such a large quantity of drugs, the district court should not have taken into account the entire amount of drugs attributed to the conspiracy when determining their respective base offense levels.[33]

"A district court's findings about the quantity of drugs implicated by the crime are factual findings reviewed under the `clearly erroneous' standard." *United States v. Rivera*, 898 F.2d 442, 445 (5th Cir, 1990). Applying this standard, we uphold the district court's determinations that the defendants could reasonably foresee the amount of cocaine for which they were held responsible.

**1**

Hodgkiss contends that the evidence does not support the district court's finding that he knew or should have reasonably foreseen that the conspiracy he founded distributed over 150 kilograms of cocaine or its equivalent. However, drug ledgers seized from Hodgkiss's residence indicate that the conspiracy was responsible for distributing approximately 56 kilograms of cocaine

---

[33] A defendant's base offense level is determined on the basis of

all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

U.S.S.G. § 1B1.3(a)(1). "Conduct `for which the defendant would otherwise be accountable' . . . includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n.1).

from January 27, 1988 to July 7, 1989. As this period constitutes approximately one-third of the conspiracy's life-span, the district court, in light of the record evidence, reasonably could have inferred that the conspiracy was responsible for distributing in excess of 150 kilograms of cocaine during its existence. Moreover, testimony presented by the government and evidence contained in the PSR, including information obtained from other defendants, also established that the conspiracy distributed in excess of 150 kilograms of cocaine.[34] Consequently, the district court's finding that Hodgkiss, who organized and retained control over every aspect of the conspiracy, knew or should have reasonably foreseen the amount of controlled substances distributed by the conspiracy is not clearly erroneous.

## 2

Gregg also contends that the district court improperly held him accountable for an excessive quantity of drugs. However, Gregg, pursuant to a carefully devised plan, delivered multiple kilograms of cocaine to Richard Townsen for John Rogala that Rogala later sold to Hodgkiss. Moreover, Norman Allanson testified that Gregg transported, or attempted to transport, twenty-one kilograms of cocaine from Florida to Texas for Rogala, who also joined forces with Hodgkiss to manufacture a large quantity of methamphetamine. Furthermore, the PSR indicates that Gregg was involved in

---

[34] We note that government agents repeatedly classified this as "conservative" estimate of the entire amount of illegal substances distributed during the life of the conspiracy.

transporting massive quantities of cocaine for Allanson and Rogala. *See also* part II.B.2 *supra*. "[A]n individual dealing in a sizable amount of controlled substances ordinarily will be presumed to recognize that the drug organization with which he deals extends beyond his universe of involvement."[35] *United States v. Thomas*, 963 F.2d 63, 65 (5th Cir. 1992). Thus, the district court's finding that Gregg was responsible for the distribution of over 150 kilograms of cocaine is not clearly erroneous.[36]

---

[35] In this regard, we note that Gregg apparently was not a novice in matters related to the distribution of controlled substances. Ledgers seized from Gregg's residence indicated that, separate from the Hodgkiss conspiracy, he was responsible for drug sales of over $245,000 between 1987 and 1990.

[36] Gregg argues that recent amendments to the commentaries and application notes for U.S.S.G. § 1B1.3 indicate that the district court erroneously held him accountable for a quantity of drugs not reasonably foreseeable to him. Illustration (c)(7) to application note 2 provides:

> Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount . . ., rather than the much larger quantity imported by Defendant R.

In *United States v. Maseratti*, 1 F.3d 330, 340 (5th Cir. 1993), we cited this illustration when vacating the sentences of defendants convicted of conspiring to distribute drugs "who may [have been] involved in less than the entire conspiracy." *Maseratti*, however, is distinguishable from the present case because the evidence indicates that Gregg, like the other defendants, did not enter into an agreement involving limited conduct like that described in the illustration. Instead, Gregg agreed to enter into an ongoing relationship with other co-conspirators involving not only the acquisition and distribution of drugs, but also protecting the conspiracy from detection using the relatively sophisticated code and delivery systems. Moreover, the evidence indicates that Gregg knew both that he was part of a larger conspiracy and that his actions helped to ensure))indeed, were necessary for))the success

Thomas argues that the district court improperly held him accountable for the entire amount of controlled substances distributed by the Hodgkiss conspiracy. Hodgkiss's drug ledgers indicated that between January 1988 and July 1989, Thomas))whom Hodgkiss assigned code number "07"))received in excess of two kilograms of cocaine and amphetamine from Hodgkiss. Moreover, both Curtis and Clark identified Thomas as someone to whom they delivered narcotics on a regular basis for several years. Thomas also served as a conduit for the delivery of drug ledgers and drugs from Clark to Hodgkiss. *See also* part II.B.3 *supra*. Accordingly, the district court's finding that Thomas knew or should have reasonably foreseen that the conspiracy of which he was a member would distribute in excess of 150 kilograms of cocaine is not clearly erroneous.

Sanchez contends that he could not reasonably foresee that the Hodgkiss conspiracy would distribute the amount of drugs for which the district court held him responsible. However, Sanchez))whom Hodgkiss assigned code number "06"))sold large quantities of marijuana to Hodgkiss on three separate occasions. On two occasions, Sanchez received $8,800 in drug-related proceeds from Clark as payment for the marijuana. Clark also identified Sanchez as one of Hodgkiss's distributors to whom Clark delivered cocaine

---

of the conspiracy.

and amphetamine on numerous occasions. Ledgers seized from Hodgkiss's residence indicated that from January 27, 1988 to July 7, 1989, Sanchez received twenty-two ounces of cocaine and five ounces of amphetamine from Hodgkiss. Moreover, a telephone scrambling device seized from Sanchez's residence matched a similar device found in possession of Hodgkiss. *See also* part II.B.4 *supra*. Consequently, the district court's finding that Sanchez knew or should have reasonably foreseen that his co-conspirators would be responsible for distributing in excess of 150 kilograms of cocaine is not clearly erroneous.

**5**

The district court ultimately held Maxwell responsible only for the distribution of between fifteen and fifty kilograms of cocaine or its equivalent. This amount roughly corresponds to the amount of cocaine sold by Alan Gardner during the time that Gardner supplied both Hodgkiss and Maxwell with cocaine. In 1988, Maxwell began purchasing on a regular basis multi-ounce quantities of uncut cocaine from Gardner. Gardner's employee Charles Barton usually delivered the cocaine to Maxwell, and Gardner often "fronted" Maxwell the uncut cocaine. *Cf.* U.S.S.G. § 2D1.1, comment. (n.8) (noting "the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs. . . . [T]his factor is particularly relevant where smaller quantities are involved."). Maxwell also sold cocaine to Ronald McWilliams, who

at one time had been a supplier of cocaine to Maxwell. *See also* part II.B.1. *supra.* The district court found from this evidence that Maxwell reasonably should have foreseen from this evidence both that the conspiracy with which he was involved extended beyond himself and that the conspiracy was distributing at least fifteen kilograms of cocaine. Because this finding is not clearly erroneous, we will uphold Maxwell's sentence.

**B**

Thomas and Hodgkiss argue that the district court erred in sentencing them under the amendments to the sentencing guidelines effective November 1, 1989, because the Hodgkiss conspiracy ended before that date. They contend that because the 1989 amendments to the guidelines increased the penalties to which they were subject, the district court violated the Ex Post Facto Clause of the Constitution by sentencing them under the amendments.

"[A]n increase in sentence based on an amendment to the guidelines effective after the offense was committed `would be an obvious . . . violation' of the *ex post facto* clause in article 1 of the United States Constitution." *United States v. Suarez*, 911 F.2d 1016, 1021 (5th Cir. 1990) (quoting *United States v. Woolford*, 896 F.2d 99, 102 n.4 (5th Cir. 1990)). A conspiracy, however, "is a continuing offense. So long as there is evidence that the conspiracy continued after the effective date of the [amendments to the] guidelines, the Ex Post Facto Clause is not violated." *United*

*States v. Buckhalter*, 986 F.2d 875, 880 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 203, 126 L. Ed. 2d 160 (1993).

Thomas and Hodgkiss argue that no evidence exists demonstrating that any acts related to the conspiracy took place after November 1, 1989. They do not, however, argue that they withdrew from the conspiracy by taking "affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach other conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65, 98 S. Ct. 2864, 2887-88, 57 L. Ed. 2d 854 (1978); *see also United States v. Puma*, 937 F.2d 151, 157-58 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 1165, 117 L. Ed. 2d 412 (1992). If a conspirator fails to effectively withdraw from the conspiracy, he "will be sentenced under the [amendments to the] guidelines even if he himself did not commit an act in furtherance of the conspiracy after [November 1, 1989], or did not know of acts committed by other co-conspirators after [November 1, 1989], if it was foreseeable that the conspiracy would continue past the effective date of the [amendments]." *Devine*, 934 F.2d at 1332.

The district court determined that the defendants should be sentenced under the 1989 amendments because the evidence adduced both at trial and during sentencing indicated that the conspiracy did not cease until, at the earliest, the search of Hodgkiss's home in December 1989. We regard this determination as a factual finding protected by the clearly erroneous standard of review. *Id.*

After reviewing the record as a whole, we find that the district court's conclusion was not clearly erroneous.[37] Moreover, the jury, as alleged in the indictment, found the defendants guilty of conspiring to distribute drugs from "on or about June 1, 1986 and continuing until December 15, 1989." Consequently, the district court's use during sentencing of the amendments in effect at the time the conspiracy concluded did not violate the Ex Post Facto Clause.

## C

Gregg contends that he was entitled to a downward adjustment under the sentencing guidelines for minimal or minor participation in the conspiracy.[38] He argues that he was only slightly involved with the conspiracy and therefore is less culpable than the other conspirators. Section 3B1.2, however, is designed to reduce a sentence only when a defendant is substantially less culpable than the average participant in the offense. *United States v. Buenrostro*, 868 F.2d 135, 138 (5th Cir. 1989), *cert. denied*, 495 U.S. 923, 110 S. Ct. 1957, 109 L. Ed. 2d 319 (1990). The district

---

[37] For example, we note that Hodgkiss's drug ledgers indicate that at least one drug transaction occurred during December 1989. Moreover, Clark))whom Hodgkiss concedes was his employee))testified that his relationship with Hodgkiss did not end until December 1989.

[38] U.S.S.G. § 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:
(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
In cases falling in between (a) and (b), decrease by three levels.

court denied Gregg's request for a downward adjustment because Gregg was not substantially less culpable than the average co-conspirator. We agree that the record belies Gregg's argument that he was a minimal or minor participant in the Hodgkiss conspiracy. *See* parts II.B.2 and VI.A.2 *supra*. Consequently, we will not disturb the district court's finding that Gregg was not a minimal or minor participant.

## D

Gregg argues he was entitled to a downward adjustment in his offense level because he accepted responsibility for his crimes. Under § 3E1.1(a) of the guidelines, "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct," a district court may reduce the defendant's offense level by two points. However, the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1. comment. (n.2). The district court found that Gregg did not fully accept responsibility for his crimes and refused to reduce the offense level. We review this finding using the clearly erroneous standard. *United States v. Hardeman*, 933 F.2d 278, 283 (5th Cir. 1991).[39]

---

[39] We have not definitively determined what standard applies when reviewing a district court's refusal to credit a defendant's acceptance of responsibility. *Compare Hardeman*, 933 F.2d at 283 (applying the clearly erroneous standard) *with United States v. Thomas*, 870 F.2d 174, 176 (5th Cir. 1989) (applying the "without foundation" standard) *and United States v. Brigman*, 953 F.2d 906, 909 (5th Cir.) (applying the "great deference" standard), *cert.*

While Gregg accepted responsibility for some acts, he did not demonstrate "sincere contrition" regarding the full extent of his criminal conduct. *United States v. Beard*, 913 F.2d 193, 199 (5th Cir. 1990). Instead, Gregg both minimized his participation in the conspiracy even after he was found guilty and refused to discuss information contained in the drug ledgers seized from his home. *See United States v. Windham*, 991 F.2d 181, 183 (5th Cir.) (noting that a defendant is required under the pre-1992 guidelines to accept responsibility for all relevant criminal conduct to be eligible for a downward departure under § 3E1.1), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___ (1993); *United States v. Alfaro*, 919 F.2d 962, 968 (5th Cir. 1990) (same). Accordingly, the district court's finding that Gregg did not accept responsibility is not erroneous.

**E**

Gregg further contends that the district court miscalculated his criminal history category for sentencing purposes.[40] Gregg contends that the district court improperly considered hearsay evidence, supplied by a government agent, indicating that Gregg was involved in narcotics activity while on probation from a previous conviction. However, a district court "may properly consider any

---

*denied*, ___ U.S. ___, 113 S. Ct. 49, 121 L. Ed. 2d 16 (1992). For the purpose of this appeal, however, "there appears to be no practical difference between the three standards." *United States v. Cartwright*, ___ F.3d ___, slip op. at 893 (Oct. 25, 1993).

[40] The guidelines direct the district court to "[a]dd 2 points [to the defendant's offense level] if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." U.S.S.G. § 4A1.1.

relevant evidence `without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy'" during sentencing.  *Alfaro*, 919 F.2d at 964 (quoting U.S.S.G. § 6A1.3(a)).

Sworn testimony given by a government agent at a sentencing hearing generally bears sufficient indicia of reliability to be considered by the trial judge during sentencing.  *See id.* at 966 (noting that a PSR generally bears sufficient indicia of reliability); *United States v. Cuellar-Flores*, 891 F.2d 92, 93 (5th Cir. 1989) (finding uncorroborated hearsay testimony provided by a probation agent to be sufficiently reliable).  Merely because the agent's testimony was based on information obtained from one of Gregg's co-conspirators is not sufficient to bar the district court from considering it.  Consequently, the district court did not err by considering the agent's testimony when determining Gregg's criminal history category.

**F**

The jury found Gregg guilty of conspiring to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Section 841(b)(1)(A), which is the applicable sentencing provision, establishes one sentencing range for first-time offenders and another for repeat offenders.[41]  Gregg

---

[41]  In cases where death or serious injury does not result from the use of an illegal substance, first-time offenders "shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life" while repeat offenders must be sentenced to not "less than 20 years [or] more than life."  21

contends that the district court erred in sentencing him under the repeat-offender provision of the statute because the government failed to give timely notice pursuant to § 851(a)(1) of its intent to seek such enhancement.  The government responds that the notice provision of § 851(a)(1) does not apply to enhancement under the recidivist provisions of § 841(b).

Section 851(a)(1) requires the government to file an information identifying the prior drug-related convictions upon which a defendant convicted of an offense under § 841 is to be given an enhanced sentence:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous conviction to be relied upon. . . .

Thus, the § 851(a)(1) notice requirement applies "to situations in which a convicted defendant's statutory minimum or maximum penalty is enhanced under [21 U.S.C § 841]."  *United States v. Wallace*, 895 F.2d 487, 490 (8th Cir. 1990);  *see also United States v. Marshall*, 910 F.2d 1241, 1244-45 (5th Cir. 1990) ("the notice requirement applies to persons convicted of an offense under Title 21 when the Government seeks to enhance the maximum penalties under the recidivist provision of that statute"), *cert. denied*, 498 U.S. 1092, 111 S. Ct. 976, 112 L. Ed. 2d 1061 (1991);  *Hansen v. United*

---

U.S.C. § 841(b)(1)(A).

*States*, 904 F.2d 306, 309 (5th Cir. 1990) (same), *cert. denied*, 498 U.S. 1052, 111 S. Ct. 765, 112 L. Ed. 2d 784 (1991). As a result, the government failed to comply with § 851(a) by filing the enhancement notice after trial.

Because the government did not timely comply with § 851(a)(1), the district court did not have jurisdiction to enhance Gregg's sentence under the recidivist provisions of § 841(b). *United States v. Noland*, 495 F.2d 529, 533 (5th Cir.), *cert. denied*, 419 U.S. 966, 95 S. Ct. 228, 42 L. Ed. 2d 181 (1974); *see also Suveges v. United States*, ___ F.3d ___, 1993 WL 403091 (1st Cir. Oct. 14, 1993) ("The filing of such an informational notice is jurisdictional."); *United States v. Belanger*, 970 F.2d 416, 417 (7th Cir. 1992) ("Failure to file the notice prior to trial deprives the district court of jurisdiction to impose an enhanced sentence."); *United States v. Novey*, 922 F.2d 624, 627 (10th Cir.) (same), *cert. denied*, ___ U.S. ___, 111 S. Ct. 2861, 115 L. Ed. 2d 1028 (1991). Moreover,

> [e]ven when the defendant is not surprised by the enhanced sentence, was aware from the outset that his previous conviction could lead to an enhanced sentence, never challenged the validity of the prior conviction, and admitted it at the sentencing hearing, the statute prohibits an enhanced sentence unless the government first seeks it by properly filing an information prior to trial.

*United States v. Weaver*, 905 F.2d 1466, 1481 (11th Cir. 1990), *cert. denied*, 498 U.S. 1091, 111 S. Ct. 972, 112 L. Ed. 2d 1058 (1991); *see also Noland*, 495 F.2d at 533 (same). Accordingly, we

vacate Gregg's sentence and remand this matter to the district court for resentencing.

## VII

For the foregoing reasons, we REMAND to permit the district court to determine in the first instance whether the notes described herein constitute either Jencks Act or *Brady* material. We REVERSE as to Gregg's sentence and REMAND for resentencing. We AFFIRM the district court's decision in all other respects.