**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 93-1445

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RUBEN PALACIOS a/k/a "Tapon", OSCAR JAVIER PEREZ,
RAMIRO ENRIQUEZ, and ABEL EDUARDO JIMENEZ-LOPEZ
a/k/a Lalo & Changa,

Defendants-Appellants.

---

No. 93-1617

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

BETTY BIGGINS and CLYDE BIGGINS,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Northern District of Texas
(3:92-CR-279-R(12))

(June 1, 1995)

Before BARKSDALE and PARKER, Circuit Judges, and COBB[1], District

---

[1]District Judge of the Eastern District of Texas, sitting by
designation.

Judge.

ROBERT M. PARKER, Circuit Judge:[2]

Ruben Palacios (Palacios), Oscar J. Perez (Perez), Abel Eduardo Jimenez-Lopez (Jimenez), Ramiro Enriquez (Enriquez), Betty Biggins (Ms. Biggins) and Clyde Biggins (Mr. Biggins) appeal from final judgments of conviction in a criminal case.

On June 17, 1992, Appellants were indicted along with 28 other defendants on drug conspiracy charges. The indictment also charged violations of various substantive offenses, including possession of controlled substances with intent to distribute and money laundering. Palacios, Perez, Jimenez and Enriquez were tried to a jury, while Ms. Biggins and Mr. Biggins were tried to the court during the same trial.

All Appellants were adjudged guilty on most counts: Enriquez was acquitted on one count of possession of cocaine with intent to distribute and Ms. Biggins was acquitted of the conspiracy charge. Appellants were sentenced to terms of imprisonment ranging from 63 months to 360 months. We affirm in part, vacate and remand in part.

## FACTS

Jose Clemente Ortiz (Ortiz) was the leader of a drug trafficking enterprise with operations primarily in Laredo and

---

[2]Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the court has determined that this opinion should not be published.

Dallas, Texas. The Ortiz organization imported, transported and distributed large quantities of marijuana and cocaine from Mexico from 1979 until the date of the indictment. Over the two week trial, the government presented evidence of many discrete sales and shipments, each involving one or more of the alleged conspirators, which will be detailed as necessary in the discussions below.

## SUFFICIENCY OF THE EVIDENCE

a. Standard of review

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to and draw all reasonable inferences in support of the jury's verdict. If a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the convictions must stand. *United States v. Cordova-Larios*, 907 F.2d 40, 41 (5th Cir. 1990).

b. Jimenez's convictions

Jimenez was charged in three counts of the superseding indictment. Count 1 charged that he was a participant in a conspiracy to possess with intent to distribute cocaine and marijuana. Count 3 alleged that on or about April 14, 1988, Jimenez possessed in excess of 100 kilograms of marijuana with intent to distribute. Count 37 alleged that on or about February 18, 1992, he possessed in excess of 100 kilograms of marijuana. He contends on appeal that the evidence was insufficient to sustain his convictions for conspiracy or for the substantive possession charges.

3

In a drug conspiracy prosecution under 21 U.S.C. §§ 841(a)(1) and 846, the Government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that the defendant knew of the agreement, and (3) that he voluntarily participated in the agreement. *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992); *United States v. Leed*, 981 F.2d 202, 205 (5th Cir. 1993).

To sustain a conviction for possession with intent to distribute, the Government must show that the defendant (1) knowingly (2) possessed contraband (3) with the intent to distribute it. *United States v. Villasenor*, 894 F.2d 1422, 1426 (5th Cir. 1990); *United States v. Garcia*, 917 F.2d 1370, 1377 (5th Cir. 1990). Possession of contraband may be actual or constructive, and may be proven by either direct or circumstantial evidence. *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982). Constructive possession exists when the defendant has ownership, dominion and control over the contraband itself, or dominion and control over the vehicle in which it was concealed. *United States v. Richardson*, 848 F.2d 509, 512 (5th Cir. 1988).

The intent to distribute element can be inferred from the quantity possessed. *Vergara*, 687 F.2d at 62. Jimenez does not challenge the fact that the two loads of marijuana attributed to him were distribution quantities.

Further, the substantive counts of the indictment alleged guilt by aiding and abetting. To sustain a conviction of aiding and abetting under 18 U.S.C. § 2, the Government must show that the

4

defendant (1) associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed. *United States v. Menesses*, 962 F.2d 420, 427 (5th Cir. 1992).

Jimenez does not dispute that the government established the existence of a conspiracy, but rather challenges the sufficiency of the evidence to establish his knowledge of and participation in the scheme, or his knowing possession of the marijuana. He points out that while presence or association with conspirators is one factor that the jury may rely on, along with other evidence, in finding conspiratorial activity by a defendant, it is well established that mere presence at the crime scene or close association with conspirators, standing alone, will not support an inference of participation in the conspiracy. *United States v. Fitzharris*, 633 F.2d 416, 423 (5th Cir. 1980), *cert. denied*, 451 U.S. 988 (1981). The government's case against Jimenez was circumstantial. While circumstantial evidence may be particularly valuable in proving the existence of the conspiracy, this Court will not lightly infer a defendant's knowledge of and participation in a conspiracy. *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.), *cert. denied*, 464 U.S. 842 (1983).

The testimony at trial established the following:

In early 1988, Ortiz sold about 100 pounds of marijuana to Daryl Smith (Smith). Ortiz and Smith drove to La Retama, a store owned by Jimenez, where Ortiz went inside and retrieved a sample for Smith from "Abel." Smith decided to buy it, and left his truck

at La Retama to be loaded with the marijuana.  Smith came back to get the truck when a signal was received that it was ready.  The loaded truck was left on the rear parking lot at the store, near the dumpster.  In March of 1992, Ortiz again sold Smith marijuana that Ortiz said he was getting form "Abel" at La Retama.  The transaction was accomplished in a similar way.  In Smith's dealings with Ortiz, Abel's name came up quite a bit.

The first possession count was based on a particular shipment of marijuana from Laredo to Dallas, made on April 14, 1988.  The drugs were sent via Brown Express under a bill of lading describing the contents of the crate as two water pumps.  Law enforcement officers had the crate under surveillance because a drug dog alerted on it before it left Laredo.  When the crate arrived in Dallas, Pablo Rodriguez (Rodriguez) came to Brown Express and claimed it.  He loaded it into a pickup truck owned by Jimenez, and drove to a building that had been the former location of La Retama and was still owned by Jimenez.  Jimenez, along with three male passengers, followed the marijuana-laden pickup truck in Jimenez's Oldsmobile, conducting what the law enforcement officers referred to as counter-surveillance.  When Jimenez realized police were watching, he took evasive action, eventually driving off at a high rate of speed.  Rodriguez waited at the old La Retama location for several hours, during which time the Oldsmobile drove by once. Rodriguez made some phone calls, and eventually drove the pickup truck to the current La Retama location.  While there he spoke with Jimenez's wife and made more phone calls.  Eventually, Rodriguez

6

was arrested and the truck seized. A plastic bag containing a pair of sneakers, Rodriguez's wallet and the keys to the truck were retrieved from Mrs. Jimenez-Lopez.

In addition, there was evidence of seven other such shipments through Brown Express that were substantially similar to the one that resulted in Rodriguez's arrest, and some long distance phone calls between the drivers of two of these shipments and La Retama.

The second possession count was based on an incident involving 586 pounds of marijuana on February 19, 1992. The marijuana was in a van owned by Jimenez that was parked across from the driveway of Jimenez's girlfriend's house. On the evening of February 19, a car owned by Jimenez's girlfriend and driven by a man identified as Raul, who had been seen at La Retama, drove up to the van and Palacios got out. Palacios drove the van and Raul drove the other vehicle, traveling together. The police stopped the van, Palacios was arrested and taken into custody, and the van and the marijuana were seized. A short while later, Raul was stopped in the vicinity of the La Retama.

After Palacios was arrested, Jimenez had a telephone conversation with Ortiz which was intercepted by a wire tap. During this phone call, Jimenez referred to Palacios being in jail "with 500, with the stuff," and the two men discussed trying to get Palacios out of jail.

Finally, a search of Jimenez's home yielded a note that said "no dope on credit," business cards with Ortiz's name and pager number, and $17,000 in cash. In a search of Jimenez's office at La

7

Retama, police seized notes with names and phone numbers for Ortiz, Enriquez and Palacios.

Jimenez asserts that a rational trier of fact could not have found beyond a reasonable doubt that he participated in the conspiracy, or that he "possessed" the contraband in the two substantive counts. He relies on arguments that question the credibility of some testimony, (e.g., Was Jimenez actually the driver of the Oldsmobile doing counter surveillance on the truck full of marijuana?) and the inferences drawn from other testimony (e.g., Did people repeatedly borrow Jimenez's vehicles, use his office at La Retama and make calls from his business phone without his knowledge that they were dealing in drugs?). The cumulative force of the evidence was sufficient on each count of conviction.

SINGLE OR MULTIPLE CONSPIRACIES

The indictment in this cause alleged a single conspiracy, headed by Ortiz, existing from March 1988 to June 1992. Enriquez and Jimenez argue that a material variance exists between the offense charged in the indictment and the proof educed at trial, which reflected multiple conspiracies. The jury was correctly instructed, both during the trial and in the written charge, that they could not find the defendants guilty if the proof established multiple conspiracies. We will affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt. *United States v. De Varona*,

8

872 F.2d 114, 118 (5th Cir. 1989).

A material variance occurs when there is a variation between proof and indictment, but does not modify an essential element of the offense charged. *United States v. Thomas*, 12 F.3d 1350, 1357 (5th Cir. 1994). A conviction will not be reversed for such a variance in the evidence unless "(1) the defendant establishes that the evidence the government offered at trial varied from what the government alleged in the indictment, and (2) the variance prejudiced the defendant's substantial rights." *United States v. Puig-Infante*, 19 F.3d 929, 935-36 (5th Cir. 1994).

In determining whether the government proved a single conspiracy or multiple conspiracies, two separate tests have been set forth. In *Puig-Infante*, 19 F.3d at 936, the following factors were held determinative: "1) whether there was a common goal, 2) the nature of the scheme, and 3) whether the participants in the various dealings overlapped." (citing *United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992)). In *Thomas*, 12 F.3d at 1357, we articulated five elements that guide in our determination of this question: "(1) the time period involved, (2) the persons acting as co-conspirators, (3) the statutory offenses charged in the indictment, (4) the nature and scope of the criminal activity, and (5) the places where the events alleged as the conspiracy took place." (citing *United States v. Lokey*, 945 F.2d 825, 831 (5th Cir. 1991)). Finally, in analyzing whether the nature of a scheme points to a single conspiracy, we ask whether "the activities of one aspect of the scheme are necessary or advantageous to the

9

success of another aspect of the scheme or to the overall success of the venture." *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982).

Jimenez contends that the activities in which he was a participant were not connected to the other drug transactions proved up at trial. He argues that although the nature of the scheme for each group was to sell contraband, one group did not depend on another.

Enriquez takes a similar position, arguing that the evidence tied him to a cocaine conspiracy in November 1991 that was unrelated to the March 1988 - June 1992 conspiracy alleged in the indictment. Enriquez was the owner of Amigo Paint and Body Shop. Horacio Gutierrez (Gutierrez), who was hired as the manager of Amigo Paint and Body in February 1992, testified that Enriquez bragged to him that he was selling up to 80 kilograms of cocaine a week. Gutierrez testified that Ortiz, whom they called El Cabezon or "the big man," was frequently at Amigo Paint and Body Shop and was supplying Enriquez with the cocaine that he sold. He also described a trip that Jimenez and Enriquez made to Laredo to pick up a thousand pounds of marijuana. The deal went sour and Jimenez kept the whole thousand pounds. Other cocaine dealers testified that they got cocaine from Raymond Lopez, who was supplied by Ortiz up until November 1991, when Enriquez began supplying their cocaine.

The evidence established that the common goal of all the co-conspirators was the sale of marijuana and cocaine. With regard to

10

the overlap of participants factor (or the "persons acting as co-conspirators" factor in the *Thomas* test) the evidence supports the allegation that Ortiz was a central figure, while various combinations of other defendants furthered his illegal activities in different ways at different times. The evidence concerning nature and scope of the criminal activity or scheme (factor (2) under *Puig-Infante*, (4) under *Thomas*) supports a finding that all activities charged against all defendants advanced a single drug distribution network. The relatively lengthy time period, March 1988 – June 1982, lends itself to the beginning and ending of multiple conspiracies, and must be closely scrutinized. Government witness Daryl Smith noted during his testimony concerning the various people, places, vehicles and operating procedures in the Ortiz organization, "there's nothing consistent in this business." Nonetheless, the evidence in this case supports a finding of a single ongoing drug distribution scheme run by Ortiz. Finally, the conspiracy charged involved the movement of drugs in wholesale quantities from Laredo, Texas to Dallas, Texas and the re-distribution of drugs from Dallas stashhouses. Nothing about the location of the alleged activities leads us to believe that there were multiple conspiracies.

Under either the *Thomas* test or the *Puig-Infante* test, there is sufficient evidence to support the jury conclusion that appellants were participants in the one conspiracy alleged in the indictment.

Even if there was more than one conspiracy proven, the

11

resulting variance from the indictment is not reversible error unless the defendants' substantial rights were prejudiced. Since the evidence in this case was sufficient to prove each defendant's participation in at least one of many related transactions, we find that no such prejudice occurred. *United States v. Faulkner*, 17 F.3d 745, 762 (5th Cir. 1994).


PEREZ'S DOUBLE JEOPARDY CLAIM

Perez was characterized as a gofer who worked for another co-conspirator named Juan Chapa (Chapa), who is Perez's brother-in-law. All the alleged acts by Perez occurred in 1989. Since late 1989 Perez has been incarcerated in a federal prison for what he contends is the same conspiracy. That conviction arose out of an attempt by Rebecca Valencia-Ponce to broker 2,000 pounds of marijuana between an undercover DEA agent and purchasers, which included Perez and Chapa in Laredo, Texas. Perez, Chapa, and two other people not included in the present indictment were charged with conspiring together and with "other persons unknown to the grand jury" to violate 21 U.S.C. § 846.[3]

---

[3]The essential allegations are:
Laredo indictment
> On or about October 10, 1989, in the Southern District of Texas and within the jurisdiction of the Court, Defendants Juan Manual Chapa, Rebecca Valenica-Ponce, Amaro Medina, and Oscar Javier Perez-Ramos did knowingly and intentionally conspire and agree together and with other persons unknown to the Grand Jurors to knowingly and intentionally possess with intent to distribute a quantity in excess of 100 kilograms of marihuana, a Schedule I controlled substance. [Violation: Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B).]

The district court denied Perez's motion to dismiss his conspiracy count on double jeopardy grounds, and made findings pursuant to *United States v. Marable*, 578 F.2d 151 (5th Cir. 1978), which sets out a five factor test identical to the one used in *Thomas*. The court found that the conspiracies covered different times, the first being a single day, October 10, 1989, the second covering a four-year period from March 1988 - June 1992. Second, Perez and Chapa were the only two people who were indicted in both cases. The district court found,

> [s]pecifically, the Laredo indictment does not name Jose Ortiz who is alleged to be the head of the organization in the Dallas indictment. There is no indication that Ortiz was involved in the incident involved in Laredo and no indication that he or any of the lieutenants working under him had any connection with the incident in Laredo.

Third, although both indictments involve alleged conspiracies in violation of § 846, the court found that the facts underlying the Laredo indictment were not charged in the Dallas indictment, nor was any evidence concerning that transaction presented in court during the trial of this case. Fourth, the district court considered the nature and scope of each indictment: Laredo involved

Dallas indictment
> From at least March 1988, the exact date being unknown to the Grand Jury, and continuing thereafter until on or about June 17, 1992, in the Northern District of Texas and elsewhere,... 4. Juan Chapa,... 8. Oscar Javier Perez... defendants, did knowingly, willfully and unlawfully combine, conspire, confederate and agree together, with each other and with diverse other persons known and unknown to the Grand Jury, to commit certain offenses against the United States...All in violation of Title 21 United States Code, Sections 846, 841(b)(1)(A), and 841 (B)(1)(B).

13

a single transaction taking place on a single day, while the Dallas case involved extensive transactions over a four-year period. Fifth, the Laredo incident was limited to Laredo, while the Dallas indictment involved a number of locations, including Mexico, Dallas, Laredo, and other places.

Perez contends that the transaction which led to his earlier conviction was one of the smaller drug deals which made up the overarching conspiracy charged in the Dallas indictment. It occurred during the time alleged in the Dallas indictment. In fact, it occurred during 1988-89 which is the only part of the Dallas conspiracy that Perez participated in, due to his 1989 conviction. The statutory offenses were the same. The overt act alleged in the first indictment was possession with intent to distribute in excess of 100 kilograms of marihuana. No overt act was alleged in the second indictment, but the evidence at trial established that the possession and distribution of marihuana and cocaine were the violations on which that indictment was based. The sale occurred in Laredo, which is also included in the Dallas indictment. Finally, Perez contends the difference in players that the trial court focused on was not a real difference.

There is no dispute that the district court applied the correct legal analysis and considered the proper factors in determining whether the present charge violated the double jeopardy violation. The factual conclusion reached by the court below that the two charges did not arise out of the same conspiracy is not clearly erroneous, so we must affirm Perez's conspiracy conviction.

14

JURY INSTRUCTIONS ON PEREZ'S MONEY LAUNDERING CHARGE

Perez was charged in count 12 of the indictment with violating or aiding and abetting in the violation of 31 U.S.C. § 5324(1) and (3).  The evidence showed that he was one of two individuals that structured a $16,880 transaction by going into two banks on the same day, each time buying a cashier's check for less than $10,000.

The statutes that Perez was charged with violating, 31 U.S.C. § 5324(1) and (3), provide that:

> No person shall for the purpose of evading the reporting requirements of § 5313(a) with respect to such transaction --
> (1) cause or attempt to cause a domestic financial institution to fail to file a report required under § 5313(a)...or
> (3) structure or assist in structuring, or attempt to structure or assist in structuring,
> any transaction with one or more domestic financial institution.

The trial court instructed the jury that in order to establish a violation of 31 U.S.C. § 5324(1), the government must prove:

> <u>First</u>, that the Defendant Oscar Javier Perez knowingly and willfully caused or attempted to cause a domestic financial institution to fail to file a Currency Transaction Report, IRS Form 4789; and

> <u>Second</u>, that the Defendant Oscar Javier Perez did so for the purpose of the evading the reporting requirements of section 5313(a).

The jury instructions articulated the elements of § 5324(3) as:

> <u>First</u>, that the Defendant Oscar Javier Perez knowingly and willfully structured or assisted in structuring a transaction involving at least $10,000 in currency for deposit into a financial institution; and

> <u>Second</u>, that the purpose of the structuring was to avoid the requirement of filing a Currency Transaction Report, IRS Form 4789.

"Knowingly and willfully" were defined as "the defendant knew of

15

the reporting requirement and specifically intended that the required reports not be filed."

The jury convicted Perez only of aiding and abetting a violation of § 5324. The district court's charge on aiding and abetting required proof:

> First, that each element of the offenses which the defendant...is accused of aiding and abetting was committed by the persons as charged in the indictment; and
>
> Second, that the defendant...willfully participated in them, as if it were something that he wished to bring about.

"Willfully" was defined in the general instruction section of the charge to mean "that the act was committed voluntarily and purposely with the specific intent to violate the law."

Perez challenges these jury instructions, relying on the recent Supreme Court decision in *Ratzlaf v. United States*, ___U.S.___, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), which held that in order to convict under § 5324, the government must prove that the defendant knew that structuring was unlawful. This case was tried prior to the Supreme Court ruling in *Ratzlaf* and the jury instructions given were in accord with the Fifth Circuit law in effect at the time of the trial. Perez did not object to the charge given or request that the trial court include a *Ratzlaf*-type instruction. His failure constitutes a forfeiture of his right to appeal this issue under FED. R. CRIM. P. 30. See *United States v. Olano*, ___U.S.___, 113 S.Ct. 1770, 1777 (1993). However, if Perez can show that the charge, as a whole, was so deficient as to affect his substantial rights, we may nevertheless reverse the conviction.

16

*Id*. at 1778.

The government argues that in convicting Perez of aiding and abetting, the instruction required the jury to find that he acted with intent to violate the law, and was therefore correct. The jury was told that it must find that Perez acted willfully, and willfully was defined as acting with "specific intent to violate the law." Although the charge was incomplete under *Ratzlaf*, we cannot say it was so deficient that it affected his substantial rights.[4]

Additionally, Perez seeks to extend *Ratzlaf* to attack his conviction on a money laundering count under 18 U.S.C. § 1956(a)(1)(B)(ii), which prohibits conducting a financial transaction that in fact involves the proceeds of a specified unlawful activity knowing that the transaction is designed to avoid a transaction reporting requirement under state or federal law. This argument has no merit, because mental state required by the money laundering statute is knowledge that the transaction involves proceeds of criminal activity and intent to avoid a reporting requirement (whether that avoidance carries criminal penalties or not). The jury was accurately instructed relative to this charge.

In a related argument Perez contends that the evidence was insufficient to establish that he knew that the money that was the

---

[4] Because the complained of charge did not affect Perez's substantial rights, it is unnecessary for us to determine if the error was "plain" under *United States v. Calverley*, 37 F.3d 160 (5th Cir. 1994).

subject of his money laundering conviction had come from illicit drug dealing.  This issue was never raised in the trial court, so this Court need only determine whether there was a plain error which affected Perez's substantial rights.  *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994).  After reviewing the evidence in the record, we find that Perez's money laundering conviction is adequately supported by the evidence and there was no plain error.

For the foregoing reasons we find that Perez's conviction for structuring and his conviction for money laundering must be affirmed.

### BIGGINS'S MOTION TO SUPPRESS

On February 1, 1992, at 2:40 p.m. a kilo of cocaine was delivered by a member of the Ortiz conspiracy to the barbecue restaurant owned by Clyde Biggins.  Mr. Biggins was not present at that time and Betty Biggins was in charge of the restaurant.  DEA agents had the delivery person under surveillance and within minutes of the delivery armed law enforcement officers entered and secured the restaurant.  They had no search warrant.  The police told Ms. Biggins that they had information that a cocaine transaction had just occurred and that she had two choices: she could either consent to a search or the police could get a warrant.  Betty Biggins responded that she did not think there were any drug deals going on and the police were free to look around.  The police seized cocaine and $18,000 in currency as a result of the search.

Both Biggins filed motions to suppress the evidence seized

18

during the search. Ms. Biggins testified at the suppression hearing and denied having ever been asked to consent to a search. The trial court found that testimony not credible and denied the motions, finding that Ms. Biggins had given a valid consent to search. On appeal both Biggins contend that while Ms. Biggins literally consented, she did so in fear of the officers or in acquiescence to a claim of authority to search.

Whether the consent to search was voluntary or was the product of duress or coercion is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). The trial court's determination that the consent was valid under the circumstances described by the evidence is not clearly erroneous.

CLYDE BIGGINS MONEY LAUNDERING CONVICTION

The Superseding Indictment charged Mr. Biggins in connection with the aborted delivery of cocaine with an attempt to transfer $18,000 knowing that the "property involved the proceeds of a specified unlawful activity and which in fact involved the proceeds of a specified unlawful activity, that is, the sale and distribution of narcotic drugs and controlled substances, with the intent to promote the carrying on of said specified unlawful activity" in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Mr. Biggins testimony and other evidence suggested that he obtained the funds through gambling rather than the distribution of drugs. Also in evidence was testimony that less than one month before the seizure of the funds, he had bought and then sold a kilogram of

19

cocaine, giving rise to an inference that he obtained $18,000 from his recent sale of the same amount of the same product. Viewing the record in the light most favorable to the government, we find the evidence sufficient to support the trial court's guilty verdict.

APPLICATION OF SENTENCING GUIDELINES

a. Standard of review.

Jimenez, Enriquez and Palacios all challenge their sentences based on the quantity of drugs attributed to them. A district court's findings about the quantity of drugs involved in an offense are factual findings subject to a clearly erroneous standard of review. *United States v. Rivera*, 898 F.2d 442, 445 (5th Cir. 1990). In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy. *United States v. Michael*, 894 F.2d 1457, 1459 (5th Cir. 1990).

b. Jimenez and Enriquez

Jimenez's base offense level was calculated at 32, based on the conclusion that he was involved with at least 1,000 kilograms, but less than 3,000 kilograms of marijuana. *See* U.S.S.G. 2D1.1(c)(6). The district court sentenced Enriquez according to an offense level of 40 based on a finding that at least 50 kilograms of cocaine were attributable to him. Jimenez and Enriquez ask us

20

to reverse and remand their cases for resentencing because the court did not make express findings on what drug quantities were tied directly to them and what drug quantities were attributable to them as "reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity." U.S.S.G. 1B1.3(a)(1)(B). This Court recently remanded a case for resentencing, instructing the district court to determine (1) when the defendant joined the conspiracy, (2) what drug quantities were within the scope of the defendant's conspiratorial agreement, and (3) of these drug quantities, which were reasonably foreseeable. *United States v. Carreon*, 11 F.3d 1225 (5th Cir. 1994). Such a remand is unnecessary in this case. The testimony at the sentencing hearing attributed over 4,204 pounds (1,910 kilograms) of marijuana directly to Jimenez, without reference to amounts that were otherwise foreseeable to him in this conspiracy. Gutierrez's testimony that Enriquez bragged about dealing 80 kilograms a week, if credited by the court, was enough to support the "more than 50 kilogram" conclusion that was the basis of Enriquez's sentence. A *Carreon* finding is inapposite in these situations.

Jimenez also argues that the trial court erred in enhancing his offense by four levels based on his role as organizer and leader, under U.S.S.G. 3B1.1(a). The evidence supports the conclusion that Jimenez directed the activities of Rodriguez, Palacios and Raul, and that the criminal activity connected with this conspiracy involved five or more participants or was otherwise extensive. This argument has no merit.

21

c. Palacios

The district court attributed approximately 24,500[5] kilograms of marijuana to Palacios. Palacios contends that the record supports only 15 kilograms of cocaine (counted as 3000 kilograms of marijuana) and 713 kilograms of marihuana. The government concedes that the record does not support the trial court finding that 24,536 kilograms of marijuana were attributable to Palacios. However, they contend that we should uphold his sentence because by making some assumptions about the testimony in the record (specifically crediting certain allegations in the presentence report at the high end of the ranges given instead of the low end) we could find 15,841 kilograms of marijuana. They argue that because Palacios's offense level was taken from the category that includes a range of 10,000 to 30,000 kilograms of marijuana, and the sentence imposed was at the lowest end of the applicable guideline range, the district court would have imposed the same sentence even if it had not erred in calculating the amount of drugs attributable to Palacios. We decline to substitute our judgment for that of the trial court, either in making the factual determination of drug quantities or in imposing a sentence on the recalculated amounts. The trial court's factual determination is

[5]To obtain a base level offense for drug offenses involving differing drug types, the Guidelines require the drugs to be converted to equivalent amounts of marihuana. U.S.S.G. 2D1.1, comment (n.10)(Nov. 1992). The converted quantities are then totalled to arrive at the base level offense. Palacios's presentence report alleged that 100 kilograms of cocaine and 4536 kilograms of marijuana were attributable to Palacios. Using the Guidelines' cocaine-to-marihuana conversion factor, 100 kilograms of cocaine equates to 20,000 kilograms of marihuana.

clearly erroneous.   The sentence must be vacated and Palacios's case remanded for resentencing.

## CONCLUSION

Having considered the other points of error urged by the Appellants, we find they have no merit.   Palacios's sentence is VACATED and REMANDED for resentencing.   All other convictions and sentences are AFFIRMED.